**E-FILED**
Friday, 20 November, 2009  04:52:19 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| v. | ) | **Case No. 09-CR-20010** |
| | ) | |
| CLIFFORD L. ALTMAN, | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION

Defendant, Clifford L. Altman, was charged via indictment on February 3, 2009, with one count of possession of five grams or more of a substance containing cocaine base (crack) with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B). On June 5, 2009, Defendant filed a Motion to Suppress Evidence (#11). Following an evidentiary hearing Defendant filed his Memorandum in Support (#16) and the government filed its Response (#17). For the following reasons, Defendant's Motion to Suppress Evidence (#11) is DENIED.

### BACKGROUND

First to testify at Defendant's suppression hearing was Kankakee police officer Michael Benoit. Benoit testified that he and Kankakee police Sergeant Kenneth J. Mallindine were in a marked squad car on patrol approaching the intersection of East Locust Street and North Rosewood Avenue in Kankakee. While pulling up to the intersection they observed an individual, later identified as Defendant, standing in the roadway leaning into a car speaking with someone. There was a car behind Defendant waiting to go. The officers determined that Defendant was obstructing

traffic, which was a traffic violation.  Benoit put his spotlight on Defendant and the vehicle he was standing at.  At that point the vehicle left and the officers exited their squad car to speak with Defendant.  The officers asked Defendant for identification and Defendant provided Benoit with his ID card.  Benoit took the ID back to his squad car and radioed the name, Clifford Altman, date of birth, and description (male, black) to his dispatch.  Dispatch[1] responded to Benoit that the name came back with an "Adam 6" designation, indicating that the person they were dealing with had a warrant.

Once informed of the warrant, Sgt. Mallindine and an Officer Halper, who had arrived on the scene, grabbed Defendant's hand or wrists and informed him he was under arrest.  As the officer's attempted to place Defendant under arrest, he began to struggle.  The officers attempted to tase the Defendant, but that was ineffective.  The officers and Defendant eventually went to the ground, where Defendant was placed into handcuffs.  During the struggle Benoit's nose was broken by Defendant.  Although Benoit did not know if Defendant intentionally broke his nose, he was sure that Defendant was intentionally struggling with him.  Also during the struggle Benoit felt Defendant tug at his equipment belt.  Benoit went to the hospital for treatment for his injury.

Benoit had not had any prior contact with Defendant before this incident and prior to this would not have recognized him on sight as Clifford Altman.  Benoit later learned that the warrant in question used to arrest Defendant actually belonged to Daryl Green.[2]  Benoit did not know Green

---

[1]Dispatch in Kankakee is run through a joint city and county communication center known as KanComm (Kankakee Communications).

[2]Green's file on KanComm indicated he used the name "Clifford Altman" as an alias, which is why when Defendant's name was radioed into KanComm, it came back as having a warrant attached to it.

either.  Government Exhibit 1 was a printout of the screen that dispatch would have been reading from, and it showed Defendant to be 29 years old.  Defendant's Exhibit 1 was the actual arrest warrant for Daryl Green, which showed Green to be 55 years old.  Benoit testified, however, that he did not have access to either the dispatch screen or the arrest warrant.  All Benoit knew before effecting Defendant's arrest was that after providing Defendant's name and date of birth, there was a "warrant hit."  He did not have any other information.  Benoit testified that if there was any negligence, it was on the dispatch end.  He was acting on the best information available to him at the time, which was that Clifford Altman with a May 31, 1979 birth date had a warrant out for his arrest.  This was standard operating procedure with the Kankakee police.

Next to testify was Kankakee police Sgt. Kenneth J. Mallindine.  Mallindine was familiar with KanComm and it is staffed mostly by civilian employees.  Mallindine testified that the area where Defendant was arrested was a high crime area, with crimes involving drug activity, prostitution, loitering, and hanging out on street corners.  It is one of the busiest police beats in Kankakee.  Defendant's actions of leaning into another car and blocking the roadway, along with being a traffic violation, were also an indication of possible drug activity due to the area.

Mallindine testified that when dispatch advises them a person has a warrant out for their arrest, the only information the officers in the field are provided with is that the subject has a warrant.  Once the subject is secured and in custody, KanComm informs the officers of all the details in the warrant.  Before an arrest is effectuated and the person is secured, all the dispatch will say is "Adam 6", which alerts the officers to a warrant or possible warrant, but would not notify the suspect so as to tip them off that there is a warrant for their arrest, which may cause them to resist or flee.  It is an officer safety issue.  Once a suspect is secured the officers can determine whether

or not the warrant is valid by verifying it.  Verifying the warrant is done by checking various identifying characteristics such as scars, marks, tattoos, height, weight, complexion, eye color, or hair color.  The officers can then determine if there is a discrepancy between the warrant and the person arrested.  There have been cases where a person has been arrested based on a warrant, the warrant was then found upon verification not to pertain to the arrested person, and the person was released.  Here, if Defendant had not resisted, he would have been released upon verification.  Instead, he resisted.

After Defendant had been secured the warrant verification process began and the officers learned that the person wanted on the warrant was Daryl Green and that Green had used Altman's name as an alias, or vice versa.  In the KanComm system when someone uses an alias, it is logged and noted.  By checking height and weight, they learned that Defendant was not Green.  However, at the time of the arrest, all the officers knew was that there was a valid warrant  for a "Clifford Altman."  Mallindine did not know either Defendant or Green before this incident.

## ANALYSIS

Defendant argues that the arresting officers' reliance on a warrant that turned out to be for someone other than Defendant was not objectively reasonable.  The government counters that the officers acted on an objectively reasonable belief that there was an outstanding arrest warrant for Defendant.

Both parties cite to the recent U.S. Supreme Court decision in United States v. Herring, 129 S.Ct. 695 (2009).  In Herring, Investigator Mark Anderson learned that Bennie Dean Herring had driven to the Coffee County Sheriff's Department to retrieve something from his impounded truck.  Herring was no stranger to law enforcement and Anderson asked the county's warrant clerk to check

for any outstanding warrants for Herring's arrest.  When none were found, Anderson asked her to check with her clerk counterpart in neighboring Dale County, and it was learned that there was an active arrest warrant for Herring's failure to appear on a felony charge.  The Coffee County clerk relayed the information to Anderson and the clerk asked Dale County to fax over a copy of the warrant as confirmation.  Anderson and a deputy followed Herring as he left the impound lot, pulled him over, and arrested him.  A search incident to arrest revealed meth in Herring's pocket and a pistol in his vehicle.

However, there had been a mistake about the warrant.  The Dale County sheriff's office computer records are supposed to correspond to the actual arrest warrants, which the office also maintains, but when the Dale County clerk went to the files to retrieve the actual warrant to fax to the Coffee County clerk, she was unable to find it.  She then learned the warrant had been recalled five months earlier.  For whatever reason, the information about the warrant recall for Herring did not appear in the database.  She immediately called the Coffee County clerk to alert her to the mixup, and Anderson was then informed.  This all unfolded in about 10-15 minutes, but Herring had already been arrested and found with the gun.

The Supreme Court upheld the lower court rulings denying the motion to suppress.  The Court noted that it must consider the actions of all the police officers involved and that the Coffee County officers did nothing wrong.  Herring, 129 S.Ct. at 699-700.  Crucial to the Court's decision, however, was that it found that Dale County's failure to update their computer database to reflect the recall of the arrest warrant was negligent, but not reckless or deliberate.  Herring, 129 S.Ct. at 700.  The fact that a Fourth Amendment violation occurred, an unreasonable search, does not necessarily mean that the exclusionary rule, which should be a last resort, applies.  Herring, 129

S.Ct. at 700.  The benefits of the exclusionary rule must be weighed against its substantial social costs.  The principle cost of applying the rule is letting guilty and possibly dangerous defendants go free - something that offends the basic concepts of the criminal justice system.  Herring, 129 S.Ct. at 701.         When police act under a warrant that is invalid for lack of probable cause, the exclusionary rule does not apply if the police acted in objectively reasonable reliance on the subsequently invalidated warrant, e.g. "Good faith."  Herring, 129 S.Ct. at 701.  Likewise, the exclusionary rule does not apply when a warrant was invalid because a judge forgot to make a "clerical correction" to it.  Herring, 129 S.Ct. at 701.  The good faith rule has also been extended to warrantless administrative searches performed in good faith reliance on a statute later declared unconstitutional and to police who reasonably relied on mistaken information in a court's database that an arrest warrant was outstanding.  Herring, 129 S.Ct. at 701.

The extent to which the exclusionary rule is justified by these deterrence principles varies with the culpability of law enforcement conduct.  The abuses that gave rise to the use of the exclusionary rule featured intentional conduct that was patently unconstitutional.  Herring, 129 S.Ct. at 702.  To trigger the rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.  The exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systematic negligence, but the error in Herring's case did not rise to that level.  Herring, 129 S.Ct. at 702.

In Herring, the pertinent analysis of deterrence and culpability is objective, and not an inquiry into the subjective awareness of the arresting officer, and the conduct at issue in that case was not so objectively culpable so as to require exclusion.  Herring, 129 S.Ct. at 703.  If the police

have been shown to be reckless in maintaining a warrant system, or to have knowingly made false entries to lay groundwork for future false arrests, exclusion would certainly be justified under Supreme Court precedent should such conduct cause a Fourth Amendment violation.  There was no evidence that errors in Dale or Coffee County were widespread.  The Court concluded that where police mistakes are the result of negligence such as that described here, rather than systemic error or reckless disregard of constitutional requirements, any marginal deterrence does not pay its way, and "the criminal should not 'go free because the constable has blundered.'"  Herring, 129 S.Ct. at 704.

Here, in Defendant's case, the exclusionary rule would not apply.  First, based on all the testimony presented at the evidentiary hearing, the officers in the field made a good faith arrest on a warrant that later turned out to be for someone else. At the time of Defendant's arrest, however, all the officers knew was that a "Clifford Altman" had a warrant out for his arrest.  There was also testimony that if Defendant had not committed a crime, resisting arrest, he would have been released from police custody once the warrant verification process had concluded.  Further, it is well settled that a defendant cannot resist even an unlawful arrest by resorting to violence.  See United States v. Pryor, 32 F.3d 1192, 1195-96 (7th Cir. 1994).  The court agrees with the government that independent of the arrest warrant, probable cause to arrest Defendant developed when he resisted arrest and physically battered the officer.

Also, there has been no showing that the police had been reckless in maintaining a warrant system or that they had made false entries.  See Herring, 129 S.Ct. at 703.  Rather, the evidence shows that the warrant system collected aliases of people who had been arrested and stored those aliases in the person's file for future arrests or warrants.  When a name is radioed in, all the aliases

are checked, and if a person with a warrant out for them has an alias that matches the name of the person radioed in, the officers are notified as to the existence of the warrant.  Before an arrest is effectuated, all the officers in the field know is the "Adam 6" signal, which is done so as not to tip off the suspect as to the warrant or the warrant's nature, which may cause them to flee or resist.  It is, Officer Mallindine testified, an officer safety issue.  It is not, however, evidence of reckless maintenance of a warrant system or false entries into said system on the part of law enforcement.

For the foregoing reasons, Defendant's Motion to Suppress Evidence (#11) is DENIED.

IT IS THEREFORE ORDERED:

(1) Defendant's Motion to Suppress Evidence (#11) is DENIED.

(2) This case remains set for a status conference on December 8, 2009, at 11:00 am in Courtroom A.

ENTERED this 20th day of November, 2009

**s/ Michael P. McCuskey**
MICHAEL P. McCUSKEY
CHIEF U.S. DISTRICT JUDGE